# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

March 2, 2011

No. 09-50078

Lyle W. Cayce
Clerk

JAMES DEMOSS

Plaintiff - Appellant

v.

CHRISTINA MELTON CRAIN, Chairman of the Texas Board of Criminal
Justice; NATHANIEL QUARTERMAN, DIRECTOR, TEXAS DEPARTMENT
OF CRIMINAL JUSTICE, CORRECTIONAL INSTITUTIONS DIVISION;
ED OWENS, Deputy Director of Texas Department of Criminal Justice,
Correctional Institutions Division; TEXAS BOARD OF CRIMINAL JUSTICE;
ROBERT EASON, Senior Warden Robertson Unit; RONALD WILLIAMS,
Captain of Corrections Officers; D SWEETIN, Senior Warden Eastham Unit;
FRANKLIN REESCANO, Assistant Warden Eastham Unit; VANCE DRUM,
Chaplin Eastham Unit; HAYWOOD TALIB, Chaplin Robertson Unit; BILLY
PIERCE, Director of Chaplaincy

Defendants - Appellees

Appeal from the United States District Court
for the Western District of Texas
No. 1:06-CV-00862

Before KING, DAVIS, and SOUTHWICK, Circuit Judges.

PER CURIAM:[*]

---

[*] Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not
be published and is not precedent except under the limited circumstances set forth in 5TH CIR.
R. 47.5.4.

No. 09-50078

Plaintiff–Appellant James DeMoss challenges several Texas Department of Criminal Justice policies under the Religious Land Use and Institutionalized Persons Act and 42 U.S.C. § 1983. Following a bench trial, the district court entered judgment for the Defendants–Appellees. We AFFIRM the judgment of the district court.

## I. FACTUAL & PROCEDURAL BACKGROUND

James DeMoss is an inmate in the Texas state prison system, which is administered by the Texas Department of Criminal Justice ("TDCJ"). DeMoss filed a lawsuit against TDCJ and several prison officials in their individual and official capacities (collectively "Defendants"), alleging that several TDCJ policies impermissibly interfered with his ability to practice his religion in violation of the Religious Land Use and Institutionalized Persons Act ("RLUIPA"), 42 U.S.C. §§ 2000cc to 2000cc-5. He also asserted several claims under 42 U.S.C. § 1983, alleging that those same policies violated his constitutional rights under the First and Fourteenth Amendments. Specifically, DeMoss challenged the following policies: (1) inmates who have been confined to their cells for disciplinary infractions are prohibited from attending religious services (the "cell restriction policy"); (2) all inmate-led religious services are tape recorded when there is no prison staff member or outside volunteer present (the "recording policy"); (3) inmates are not allowed to carry a pocket-sized Bible or Qur'an (the "religious text policy"); (4) inmates must be clean-shaven (the "grooming policy"); and (5) inmates may not stand for extended periods of time in prison dayrooms (the "dayroom policy").

Both DeMoss and Defendants filed motions summary judgment. In evaluating these motions, the district court concluded that TDCJ's unequal enforcement of its cell restriction policy violated RLUIPA, and granted summary judgment to DeMoss on that claim. Additionally, the district court dismissed DeMoss's challenge to TDCJ's religious text policy for failure to state a claim.

No. 09-50078

*See* 28 U.S.C. §§ 1915(e)(B)(ii) (stating that the district court should dismiss an inmate's civil rights claim if it "fails to state a claim upon which relief may be granted."), 1915A(b)(1) (same).

DeMoss's remaining claims challenging the facial validity of the cell restriction policy and the recording, grooming, and dayroom policies proceeded to a bench trial.  After the bench trial, the district court concluded that none of TDCJ's policies violated RLUIPA or DeMoss's constitutional rights and entered judgment in favor of the Defendants on all of DeMoss's remaining claims.

## II.  DISCUSSION

DeMoss advances four arguments on appeal:  (1) the district court improperly denied his request for an injunctive, declaratory, and monetary relief for TDCJ's enforcement of the cell restriction policy; (2) the district court erred in dismissing his challenge to TDCJ's religious text policy for failure to state a claim; (3) the district court improperly concluded that TDCJ's dayroom, grooming, and recording policies did not violate RLUIPA; and (4) the district court improperly concluded that TDCJ's recording policy did not violate the First Amendment.  We address each argument in turn.  "Following a bench trial, we review the district court's conclusions of law de novo and its factual findings for clear error."  *Cerda v. 2004-EQR1 L.L.C.*, 612 F.3d 781, 786 (5th Cir. 2010).

## A.    DeMoss's RLUIPA Claims

### 1.    *RLUIPA*

The bulk of DeMoss's claims on appeal are derived from RLUIPA.  RLUIPA provides:

> No government shall impose a substantial burden on the religious exercise of a person residing in or confined to an institution . . . even if the burden results from a rule of general applicability, unless the government demonstrates that imposition of the burden on that person—

3

No. 09-50078

(1) is in furtherance of a compelling governmental interest; and

(2) is the least restrictive means of furthering that compelling governmental interest.

42 U.S.C. § 2000cc-1(a).

Under RLUIPA, the plaintiff bears the initial burden of proving that "the challenged government action 'substantially burdens' the plaintiff's 'religious exercise.'" *Mayfield v. Tex. Dept. of Criminal Justice*, 529 F.3d 599, 613 (5th Cir. 2008). A government action imposes a substantial burden on religious exercise if it "truly pressures the adherent to significantly modify his religious behavior and significantly violate his religious beliefs." *Adkins v. Kaspar*, 393 F.3d 559, 570 (5th Cir. 2004).

If the plaintiff meets this burden of proof, the burden shifts to the government to "demonstrate that its action was supported by a compelling interest and that the regulation is the least restrictive means of carrying out that interest." *Mayfield*, 529 F.3d at 613. In determining whether the government has met its burden of proof, we give "due deference to the experience and expertise of prison and jail administrators in establishing necessary regulations and procedures to maintain good order, security and discipline, consistent with consideration of costs and limited resources." *Cutter v. Wilkinson*, 544 U.S. 709, 723 (2005) (citation and internal quotation marks omitted).

### 2. TDCJ's Cell Restriction Policy

#### a. Injunctive and Declaratory Relief

DeMoss first challenges the district court's refusal to grant him a preliminary injunction against the enforcement of the cell restriction policy and its failure to issue a declaratory judgment stating that the policy violates RLUIPA. The Defendants respond that this claim is now moot because the cell

restriction policy was voluntarily changed before the bench trial, so that "all general population offenders are allowed to attend religious services while on cell restriction." In its summary judgment order, the district court concluded that TDCJ's unequal enforcement of the cell restriction policy violated RLUIPA, but did not reach a decision as to the validity of the policy itself. The policy was subsequently abandoned before the bench trial, but, despite being urged to dismiss the claim as moot by the Defendants, the district court concluded that the policy itself did not violate RLUIPA or § 1983.

On appeal, this court reviews determinations of mootness *de novo*. *Sossamon v. Texas*, 560 F.3d 316, 324 (5th Cir. 2009). A claim is moot when the parties are no longer "adverse parties with sufficient legal interests to maintain the litigation." *Id.* (quoting *United States v. Lares–Meraz*, 452 F.3d 352, 354 (5th Cir. 2006) (per curiam)). In *Sossamon,* this court addressed an identical challenge to the cell restriction policy and concluded that TDCJ's abandonment of the policy mooted the plaintiff's RLUIPA challenge to that policy. *Id.* at 326. In reaching that conclusion, this court noted that, although "a defendant has a heavy burden to prove that the challenged conduct will not recur once the challenged conduct is dismissed as moot, government actors in their sovereign capacity and in the exercise of their official duties are accorded a presumption of good faith because they are public servants, not self-interested private parties." *Id.* at 325. We therefore stated that, "[w]ithout evidence to the contrary, we assume that formally announced changes to official governmental policy are not mere litigation posturing" and concluded that an affidavit from the Director of the TDCJ stating that the cell restriction policy had been changed satisfied the government's burden of making " 'absolutely clear' that the cell-restriction condition cannot 'reasonably be expected to recur.' " *Id.*

DeMoss's challenge to the cell restriction policy is factually indistinguishable from that this court dismissed as moot in *Sossamon*. As in

No. 09-50078

*Sossamon*, the Defendants submitted an affidavit from the TDCJ director stating that the cell restriction policy had been abandoned and that all inmates on cell restriction would be allowed to attend religious services. *Id.* Furthermore, DeMoss has presented no evidence from which this court can conclude TDCJ's "voluntary cessation is a sham for continuing possibly unlawful conduct." *Id.* Therefore, TDCJ's abandonment of its cell restriction policy moots DeMoss's claim for injunctive and declaratory relief. *See id.* at 326; *see also Harris v. City of Houston*, 151 F.3d 186, 189 (5th Cir. 1998) ("[W]e find it beyond dispute that a request for injunctive relief generally becomes moot upon the happening of the event sought to be enjoined."). Accordingly, we vacate the district court's judgment, insofar as it held that the cell restriction policy did not violate RLUIPA or DeMoss's constitutional rights. *See Sossamon*, 560 F.3d at 326 & n.15 ("When . . . a party who has prevailed below makes the case moot by his unilateral action, a vacatur must be granted." (citation and internal quotation marks omitted)).

> b.    Monetary Damages

DeMoss seeks monetary damages "for the times he was denied access to religious services" under the cell restriction policy, which the district court found violated RLUPIA to the extent that it had been unequally enforced by TDCJ staff. Although this claim is not mooted by Defendants' change to the cell restriction policy, *see Sossamon*, 560 F.3d at 326, DeMoss is not entitled to damages from the unequal enforcement of the cell restriction policy. RLUIPA does not create a cause of action for damages against "Texas and the defendants in their official capacities,"[1] nor does it create a "cause of action against

---

[1] The Supreme Court has granted *certiorari* in *Sossamon* on the limited issue of " '[w]hether an individual may sue a State or state official in his official capacity for damages for violations of the Religious Land Use and Institutionalized Persons Act, 42 U.S.C. § 2000cc et seq. (2000 ed.).' " *Sossamon v. Texas*, 130 S. Ct. 3319 (2010). Despite the grant of *certiorari*, we continue to follow *Sossamon* as binding precedent. *See, e.g., Wicker v. McCotter*, 798 F.2d

defendants in their individual capacities." *Id.* at 331 & n.51. Furthermore, to the extent DeMoss seeks compensatory damages stemming from the unequal enforcement of the policy, that claim is also barred by 42 U.S.C. § 1997e(e) because he has not alleged any physical injury stemming from the cell restriction policy. *Mayfield*, 529 F.3d at 605–06.

> 3. *TDCJ's Religious Text Policy*

DeMoss next argues that the district court improperly dismissed his challenge to TDCJ's religious text policy, which forbids inmates from carrying a pocket Bible or Qur'an in certain locations. In his complaint, DeMoss stated that the policy against allowing a Bible or Qur'an at medical appointments deprived him of his ability to read them while he sought medical care. In his response to Defendants' motion for summary judgment, DeMoss stated that he had twice been denied his pocket Qur'an during medical visits and that TDCJ policies also prevented him from carrying a pocket Bible or Qur'an while on job assignment, while in the recreation yard, and while in transit. The district court determined that DeMoss had failed to state a claim because he had failed to prove that "a temporary lack of access to reading material places more than a de minimis burden on his right to free speech or the exercise of his religion." *See* 28 U.S.C. §§ 1915(e)(B)(ii), 1915A(b)(1).

This court employs the same *de novo* standard to review the dismissal of a claim pursuant to the Prison Litigation Reform Act as it uses to review dismissal pursuant to Federal Rule of Civil Procedure 12(b)(6). *Black v. Warren*, 134 F.3d 732, 733–34 (5th Cir. 1998) (per curiam). A complaint will survive a motion to dismiss if it contains "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).

---

155, 157–58 (5th Cir. 1986).

A plaintiff meets this standard when he "pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*

We agree with the district court and conclude that DeMoss failed to state a claim entitling him to relief regarding TDCJ's religious text policy. There is no dispute that reading the Qur'an is part of DeMoss's religious practice. In his complaint and response to Defendants' motion for summary judgment, DeMoss emphasized the importance of the Qur'an to those of the Muslim faith and stated that reading the Qur'an provided him with "useful studies and development toward proper morality." However, DeMoss's complaint was deficient because the facts, as pled, did not demonstrate a plausible conflict between TDCJ's policies and his religious practice. DeMoss alleged that the TDCJ policies had prevented him from carrying a pocket Qur'an with him out into the recreation yard, on two medical visits, and while on job assignment. Crucially, DeMoss did not allege that these restrictions required him to "act in a way that violated his religious beliefs," *Adkins*, 393 F.3d at 570, by forcing him to abandon his study of the Qur'an. Nor did his complaint allege facts that suggested he was forced to choose between studying the Qur'an as his faith required and a generally available, non-trivial benefit. *See id.* Based on how DeMoss characterized his religious practice, therefore, he did not allege facts from which the district court could conclude that the TDCJ policies "truly pressure[d] him to significantly modify his religious behavior and significantly violate his religious beliefs." *Id.*

On appeal, DeMoss characterized his religious practice as requiring him to "read Qur'an daily as well as to memorize and recite," and claims that TDCJ's transit policy denied him access to his Qur'an for five days after the conclusion of his bench trial. These factual allegations were not in his original complaint or response to Defendants' motion for summary judgment, so we do not consider them. *See, e.g., Theriot v. Parish of Jefferson*, 185 F.3d 477, 491 n.26 (5th Cir.

No. 09-50078

1999) ("An appellate court . . . may not consider facts which were not before the district court at the time of the challenged ruling."). Therefore we affirm the district court's dismissal for failure to state a claim.

### 4.   *TDCJ's Dayroom Policy*

DeMoss next challenges the district court's ruling regarding TDCJ's policy against allowing inmates to stand for long periods of time in prison dayrooms. As explained to the district court, inmates must sit in the dayrooms to ensure that the roving security officer has an unobstructed view of inmate conduct while they use the dayrooms. After the bench trial, the district court concluded that this policy did not violate RLUIPA because it did not impose a substantial burden on DeMoss's religious exercise and was the "least restrictive means of addressing a compelling governmental interest." There is no dispute that DeMoss's religious practice requires him to pray five times a day at set times for anywhere from four to twenty minutes, during which time he must stand, kneel, and bow. Therefore, we consider first whether DeMoss has met his burden of proving that the dayroom policy imposes a substantial burden on his ability to pray.

DeMoss argues that TDCJ's dayroom policy imposes a substantial burden on his religious practice because it requires him to choose between praying in a timely manner or standing during prayer in violation of the dayroom policy, which could result in further disciplinary action. This argument does not give a complete picture of the burden the dayroom policy imposes on DeMoss's ability to pray. DeMoss's ability to stand, kneel, and bow is not restricted in the recreation yard or in his cell, and he has hourly access to these locations from the dayroom. Thus, DeMoss is not faced with a choice between timely saying his prayers and violating TDCJ policy, but rather must choose between using the dayroom during certain hours and praying. Although the dayroom policy burdens DeMoss by requiring him to anticipate when he must leave the dayroom

to pray, this burden is not substantial because it does not pressure him to significantly modify his religious behavior or significantly violate his religious beliefs. Therefore, DeMoss is not entitled to relief on his claim that the dayroom policy was a substantial burden on the exercise of his religious beliefs, and we need not address whether this policy advances a compelling state interest and is the least restrictive means of achieving that interest.

     5.     *TDCJ's Grooming Policy*

DeMoss next challenges the district court's ruling that TDCJ's grooming policy did not violate RLUIPA. This policy states that all inmates, except those who have been issued medical exemptions, must be clean shaven. Although the Defendants disputed whether DeMoss's religious practice requires him to wear a beard of some length before the district court, they have not reurged this argument on appeal. Nor do the Defendants here challenge DeMoss's assertion that the grooming policy imposes a substantial burden on that religious practice. Therefore, this issue turns on whether the district court properly concluded that Defendants met their burden of proving that the grooming policy served a compelling governmental interest and was the least restrictive means of serving that interest.

     a.     Compelling Interest

The district court identified several compelling interests that TDCJ's grooming policy served: it ensures rapid identification of inmates, it prevents the concealment of dangerous contraband, and it reduces TDCJ's operational costs. Based on the evidence the district court heard during the bench trial, its findings of fact regarding each of these concerns were not clearly erroneous.

The district court heard testimony from prison officials stating that the grooming policy ensures inmates can be properly identified at security checkpoints in the prison. Security staff at checkpoints rely on being able to match the inmate's face with the photograph on his identification card, which

shows him clean-shaven. Security staff cannot identify inmates by memory because the staff size is small in comparison to the number of inmates, staff is frequently rotated throughout different areas of the prison, and staff turnover is frequent. Officials also testified that speedy identification issues are exacerbated when an inmate has escaped because the public may not be able to quickly identify an escaped inmate based on his identification picture if he has grown a beard. Additionally, a TDCJ official testified that the grooming policy enabled security staff to identify gang affiliations that could be covered by a beard, which would frustrate efforts to administratively segregate gang members with violent histories from the rest of the prison population. Finally, the district court heard testimony from several prison officials that the grooming policy ensures that inmates are not able to conceal bits of razor, cell phone SIM cards, and other contraband in their beards. Based on these prison safety and public safety concerns, the grooming policy furthers compelling state interests. *See Cutter*, 544 U.S. at 725 n.13 (stating that "prison security is a compelling state interest"); *Longoria v. Dretke*, 507 F.3d 898, 904 (5th Cir. 2007) (concluding that a grooming policy regarding hair length is related to prison security and advances a compelling state interest); *cf. Green v. Polunsky*, 229 F.3d 486, 490 (5th Cir. 2000) (concluding that, in context of a § 1983 claim, a prison's beard prohibition advances the legitimate penological interest of inmate identification).

        b.     Least Restrictive Means

DeMoss also disputes the district court's conclusion that the compelling state interests advanced by the TDCJ's grooming policy could not be advanced by any different or lesser means. The district court heard testimony from several prison officials explaining why neither of DeMoss's proposed alternatives to the grooming policy—allowing a religious exemption or allowing all inmates to grow one-quarter-inch beards—satisfied the prison's compelling security concerns. As noted above, testimony from TDCJ officials uniformly stated that

allowing either a religious exemption or allowing all inmates to grow one-quarter-inch beards would exacerbate the difficulty in identifying inmates at checkpoints, increase the burden of searching for contraband, and complicate identification in the event of escape.

Furthermore, the district court's finding that a partial, or total, repeal of the grooming policy would impose additional costs on TDCJ is not clearly erroneous. The district court heard uncontroverted testimony that allowing a religious exemption would impose a significant administrative burden on prison chaplains, who already spend the vast majority of their time on administrative duties. A general repeal of the grooming policy to allow for one-quarter-inch beards would avoid imposing an administrative burden on the chaplaincy, but would require TDCJ to purchase additional grooming equipment and hire more barbers thereby increasing administrative costs. Controlling these costs is a compelling state interest of its own. *See Baranowski v. Hart*, 486 F.3d 112, 125 (5th Cir. 2007) (stating that a TDCJ policy related to maintaining order and controlling prison costs involves a compelling governmental interest). Additionally, the district court heard testimony that TDCJ security would be unable to ensure inmates' beard length did not exceed one-quarter inch because the number of inmates who would wish to grow beards would likely be sizeable. Therefore, Defendants have met their burden of proving that the grooming policy is the least restrictive means of serving the compelling interests of prison security and controlling costs, and it does not violate RLUIPA.[2]

---

[2] With respect to this claim and his recording policy claim, DeMoss also argues that the district court failed to issue a "proper pretrial order defining the remaining issues for trial" because its order regarding the motions for summary judgment led him to believe that he had been granted summary judgment on whether these policies imposed a substantial burden on his practice of Islam. He avers that this mistaken belief prevented him from presenting evidence at trial to meet his burden of proof on those issues, but the record below hints at no such confusion. First, the district court explicitly stated that neither DeMoss nor Defendants were entitled to summary judgment on either of DeMoss's claims. Second, DeMoss presented evidence at trial on the alleged burden these policies imposed on his religious exercise.

*6.    TDCJ's Recording Policy*

DeMoss's final RLUIPA challenge is to TDCJ's recording policy.  Muslim religious services, unlike those of all other religious groups, may be held without prison staff or volunteers present because of a TDCJ consent decree allowing that exemption.  Therefore, TDCJ tape records all inmate-led Muslim religious services to ensure the religious services take place and to aid in investigating potential disciplinary violations.  The district court concluded that this policy did not impose a substantial burden on DeMoss's exercise of religion because he had not shown any "real burden to the exercise of the Muslim religion as a result of the recording policy, much less a substantial one."

On appeal, DeMoss's contends that the policy imposes a substantial burden on his religious exercise because Muslims "can be threatened by prison officials for preaching the tenets of our faith, using the tape as evidence."  The district court wholly rejected this contention, noting that this allegation was unsupported by evidence in the record and "contradict[s] the testimony of every TDCJ official who testified."  Prison officials unanimously testified that tape recordings are not used to discipline inmates for the discussion of religious topics.  DeMoss disputed this evidence by testifying to a lone incident in which an inmate was threatened with discipline for disparaging other religions during a Muslim service.  None of his witnesses stated that he had personally been disciplined for discussing religious topics at inmate led gatherings, that the recordings of religious services had ever been used to discipline him, or that the recording policy prevented him from discussing religious topics at inmate-led services.  Therefore, the district court's finding of fact that Muslim inmates could not be threatened with disciplinary proceedings for participating in religious discussion was not clearly erroneous.  Because DeMoss has not identified how

Therefore, this argument is without merit.

the recording policy pressures him to significantly modify his religious behavior, we agree with the district court's conclusion that TDCJ's recording policy does not impose a substantial burden on DeMoss's religious practice.

## B.   DeMoss's § 1983 Claim

DeMoss's final argument is that the district court erred in concluding that the TDCJ recording policy does not violate his First Amendment rights. Although DeMoss asserted many constitutional claims under § 1983 before the district court, on appeal, he has explicitly disclaimed all save his challenge to the recording policy. After the bench trial, the district court rendered judgment in favor of Defendants on this claim, stating that the recording policy did not dissuade inmates from attending or participating in Muslim religious services and was reasonably related to a legitimate penological interest in security.

Prison regulations that limit an inmate's fundamental right to free speech are valid if they are "reasonably related to legitimate penological interests." *Turner v. Safely*, 482 U.S. 78, 89 (1987). Satisfying the *Turner* test requires the court to determine:  (1) whether there is a "valid, rational connection between the prison regulation and the legitimate governmental interest put forward to justify it"; (2) whether "there are  alternative means of exercising the right that remain open to prison inmates"; (3) what "impact accommodation of the asserted constitutional right will have on guards and other inmates"; and (4) whether there is an "absence of ready alternatives." *Id.* at 89–90 (citations and internal quotation marks omitted).

DeMoss argues that the recording policy is irrational and does not serve any legitimate TDCJ interest. As noted above, the recording policy ensures that TDCJ is able to investigate into possible disciplinary violations that may have occurred during inmate-led religious services and, relatedly, ensures that services stay on religious topics.  TDCJ officials first became aware of the need to record inmate-led religious services when a tape was shown at an

14

unmonitored religious service that contained anti-government rhetoric, promoted violence, and disparaged other religious groups. Thus, the district court correctly concluded that the recording policy had a rational connection to the legitimate governmental interest in prison safety.

Additionally, TDCJ's recording policy did not foreclose alternative avenues of religious expression. DeMoss presented scant evidence that the recording policy stifled his ability to express his religious beliefs at religious services; as discussed above, the overwhelming evidence in the record stated that religious service recordings were not used to punish inmates for religious discussion. *See Mayfield*, 529 F.3d at 609 (asking "whether the regulation entirely stifles the prisoner's religious expression" (citation and internal quotation marks omitted)).

Furthermore, the Defendants point out that the only alternative to recording religious services would be to have staff or approved outside volunteers present, or, as with other religious groups, cancel services when no staff or volunteers are available. Either alternative would saddle TDCJ with additional administrative costs, take staff away from other postings in the prison, or reduce the number of services available for Muslim inmates. *See Mayfield*, 529 F.3d at 610 (noting that "prison security could be seriously compromised by the need to remove personnel from their usual security posts"). Thus, DeMoss has failed to point to "an alternative that fully accommodates the prisoner's rights at *de minimis* cost to valid penological interests." *Turner*, 482 U.S. at 91.

## III.  CONCLUSION

For the foregoing reasons the judgment of the district court is AFFIRMED. All pending motions are DENIED.

15