# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**
April 2, 2013

Lyle W. Cayce
Clerk

No. 11-40653

WILLIE LEE GARNER, also known as Willi Free I Gar'ner,

Plaintiff–Appellee,

v.

EILEEN KENNEDY, in her official capacity as Director, Region IV, Texas Department of Criminal Justice; SENIOR WARDEN ERNEST GUTIERREZ, JR.; BRAD LIVINGSTON, EXECUTIVE DIRECTOR OF THE TEXAS DEPARTMENT OF CRIMINAL JUSTICE; EXECUTIVE DIRECTOR RICK THALER,

Defendants–Appellants.

Appeal from the United States District Court
for the Southern District of Texas

Before REAVLEY, PRADO, and OWEN, Circuit Judges.

OWEN, Circuit Judge:

This case requires us to determine whether the Texas Department of Criminal Justice's policy of prohibiting prisoners from wearing beards for religious reasons violates the Religious Land Use and Institutionalized Persons Act (RLUIPA).[1]  After a bench trial, the district court granted declaratory and injunctive relief in favor of the plaintiff, a Muslim, to the extent that the policy

---

[1] Pub. L. No. 106-274, 114 Stat. 803 (2000) (codified at 42 U.S.C. §§ 2000cc to 2000cc-5).

No. 11-40653

prohibits him from wearing a quarter-inch beard. The defendants have appealed that ruling. We affirm.

## I

Willie Lee Garner is a Texas state prisoner in the custody of the Texas Department of Criminal Justice (TDCJ). He is currently incarcerated in the McConnell Unit in Beeville, Texas. Garner claims that as a Muslim he is required to wear a beard. However, TDCJ rules prohibit most inmates, including Garner, from having a beard, and Garner has been disciplined for his failure to comply with this policy. Some inmates are allowed to grow beards up to a quarter of an inch if they have specified skin conditions. These exemptions from the general no-beard policy are known as "clipper-shave passes." TDCJ does not issue clipper-shave passes to accommodate religious beliefs or tenets.

Garner filed a pro se complaint against a number of defendants, who we will refer to collectively as TDCJ, in the Southern District of Texas pursuant to RLUIPA and 42 U.S.C. § 1983. Garner claimed that TDCJ violated RLUIPA and his constitutional rights by prohibiting him from wearing a beard and from wearing a white head covering, known as a Kufi, to and from worship services. The district court initially denied Garner's request to appoint counsel and granted summary judgment in favor of the defendants. Garner appealed, and we reversed the district court's judgment on Garner's request for declaratory relief and injunctive relief with respect to his RLUIPA claim but affirmed in all other respects.[2]

On remand, the district court appointed counsel and held a bench trial on Garner's RLUIPA claims. After noting that it is not seriously contested that TDCJ's policies impose a substantial burden on Garner's religious exercises, the court concluded that TDCJ failed to discharge its burden to show that TDCJ's

---

[2] *Garner v. Morales*, No. 07-41015, 2009 WL 577755 (5th Cir. Mar. 6, 2009) (per curiam).

beard policy is the least restrictive means of furthering a compelling government interest. It therefore enjoined the defendants from enforcing the grooming policy prohibiting Garner from wearing a quarter-inch beard. However, the district court concluded that requiring an inmate to remove his Kufi and make it available for inspection when traveling to and from religious services is the least restrictive way of furthering TDCJ's compelling government interest in the safety and security of prisoners and prison staff. Therefore, the district court held that Garner was not entitled to declaratory and injunctive relief on his claim with respect to wearing his Kufi. TDCJ has appealed the district court's ruling that its grooming policy violates RLUIPA insofar as it prohibits Garner from wearing a quarter-inch beard.

## II

RLUIPA provides that "no government shall impose a substantial burden on the religious exercise of a person confined in an institution, even if that burden results from a rule of general applicability," unless the burden "is in furtherance of a compelling government interest" and "is the least restrictive means of furthering that compelling government interest."[3] The plaintiff initially bears the burden of showing that "the challenged government action substantially burdens the plaintiff's religious exercise."[4] In order to show a substantial burden, the plaintiff must show that the challenged action "truly pressures the adherent to significantly modify his religious behavior and significantly violate his religious beliefs."[5]

---

[3] 42 U.S.C. § 2000cc-1(a).

[4] *DeMoss v. Crain*, 636 F.3d 145, 150 (5th Cir. 2011) (per curiam) (quoting *Mayfield v. Tex. Dep't of Criminal Justice*, 529 F.3d 599, 613 (5th Cir. 2008)) (internal quotation marks omitted).

[5] *Adkins v. Kaspar*, 393 F.3d 559, 570 (5th Cir. 2004).

No. 11-40653

If the plaintiff shows that the government action imposes a substantial burden on his religious exercise, the burden then shifts to the government to show that the action was supported by a compelling interest and is the least restrictive means of furthering that compelling interest.[6] However, the Supreme Court has held that although RLUIPA requires a compelling interest, "context matters,"[7] and therefore the court must give "due deference to the experience and expertise of prison and jail administrators in establishing necessary regulations and procedures to maintain good order, security and discipline, consistent with consideration of costs and limited resources."[8]

We have not specifically addressed whether determining if a prison policy meets the requirements of RLUIPA presents a question of law or fact. At least one court has addressed this question in the RLUIPA context.[9] Several courts of appeals have addressed this question with respect to the predecessor to RLUIPA,[10] the Religious Freedom Restoration Act (RFRA),[11] which is identical

---

[6] *DeMoss*, 636 F.3d at 150 (citing *Mayfield*, 529 F.3d at 613).

[7] *Cutter v. Wilkinson*, 544 U.S. 709, 723 (2005).

[8] *DeMoss*, 636 F.3d at 150 (quoting *Cutter*, 544 U.S. at 723) (internal quotation marks omitted).

[9] *Hoevenaar v. Lazaroff*, 422 F.3d 366, 368 (6th Cir. 2005) ("[W]hether the prison regulations were the least restrictive means is a question of law" (citing *Lawson v. Singletary*, 85 F.3d 502, 511-12 (11th Cir. 1996); *Hamilton v. Schriro*, 74 F.3d 1545, 1552 (8th Cir. 1996))).

[10] *See United States v. Friday*, 525 F.3d 938, 949 (10th Cir. 2008); *United States v. Vasquez-Ramos*, 522 F.3d 914, 917 (9th Cir. 2008) (per curiam) (citing *United States v. Hugs*, 109 F.3d 1375, 1379 (9th Cir. 1997) (per curiam)); *Christians v. Crystal Evangelical Free Church (In re Young)*, 82 F.3d 1407, 1419 (8th Cir. 1996), *vacated & remanded*, 521 U.S. 1114 (1997), *reinstated in relevant part*, 141 F.3d 854, 856 (8th Cir. 1998); *Lawson*, 85 F.3d at 511-12.

[11] Pub. L. No. 103-141, 107 Stat. 1488 (1993) (codified at 42 U.S.C. §§ 2000bb to 2000bb-4).

No. 11-40653

to RLUIPA for present purposes.[12]  These courts have generally held that whether the imposition of a burden is the least restrictive means of furthering a compelling government interest is a question of law.  Because it is highly dependent on a number of underlying factual issues, we conclude that whether the imposition of a burden is the least restrictive means of furthering a compelling government interest is best characterized as a mixed question of fact and law, which is subject to de novo review.[13] As always, we review questions of fact for clear error.[14]

## III

TDCJ first argues that the district court's written opinion fails to comply with Federal Rule of Civil Procedure 52(a)(1), which requires that the district court "find the facts specially and state its conclusions of law separately."[15] Rule 52(a)(1) serves three main purposes: "1) aiding the trial court's adjudication process by engendering care by the court in determining the facts; 2) promoting the operation of the doctrines of res judicata and estoppel by judgment; and 3) providing findings explicit enough to enable appellate courts to carry out a meaningful review."[16]  Rule 52(a)(1), however, is not overly burdensome—it "'exacts neither punctilious detail nor slavish tracing of the claims issue by issue

---

[12] *See Cutter,* 544 U.S. at 714-16 (recounting the history of RFRA and RLUIPA). *Compare* 42 U.S.C. § 2000bb-1, *with* 42 U.S.C. § 2000cc-1.

[13] *See McKinley v. Abbott*, 643 F.3d 403, 407-08 (5th Cir. 2011) ("Last, we consider whether the Barratry Statute violates the United States Constitution's First Amendment guarantee to free speech.  This is a mixed question of fact and law, which we review *de novo.*").

[14] *DeMoss v. Crain*, 636 F.3d 145, 149 (5th Cir. 2011) (per curiam) (citing *Cerda v. 2004-DQR1 L.L.C.*, 612 F.3d 781, 786 (5th Cir. 2010)).

[15] FED. R. CIV. P.  52(a)(1).

[16] *Chandler v. City of Dallas.*, 958 F.2d 85, 88 (5th Cir. 1992) (per curiam) (citing *Tex. Extrusion Corp. v. Palmer, Palmer & Coffee (In re Tex. Extrusion Corp.)*, 836 F.2d 217, 220 (5th Cir. 1988)).

and witness by witness.'"[17] It requires only that the district court "issue findings with sufficient detail to enable the appellate court to consider the findings under the applicable reviewing standard."[18] We will not remand for clarification as long as "the district court's findings give the reviewing court a clear understanding of the factual basis for the decision."[19]

TDCJ cites the following paragraph from the district court's opinion as most evident of the district court's error:

> The Defendants also contend that allowing an exception to the no beard rule would have an economic impact. They are probably correct in assuming that if Plaintiff Garner were allowed to have a beard, other Muslim prisoners in the McConnell Unit would desire the same benefit. This could, and probably would, result in some additional expense to the TDCJ, but the evidence fails to demonstrate that it would be significant. The McConnell Unit already features barbering services for the benefit of those inmates who are allowed to maintain beards by virtue of a medical condition. These services might have to be expanded to accommodate Muslim prisoners, but the additional expense is unlikely to be exorbitant. Some additional expense would also be incurred in taking new photographs for prisoner identification cards, but some of that expense is covered by fees paid by the prisoners themselves. In short, the evidence as a whole fails to establish that the economic impact on the TDCJ would be significant.

TDCJ argues that this paragraph "leaves the reader to wonder what findings of fact are to be reviewed on appeal for clear error, if any, and what conclusions of law are to be reviewed de novo." It argues that instead of issuing a finding of fact as to the approximate amount of expenses, the district court couched its

---

[17] *Burma Navigation Corp. v. Reliant Seahorse MV*, 99 F.3d 652, 657 (5th Cir. 1996) (quoting *Schlesinger v. Herzog*, 2 F.3d 135, 139 (5th Cir. 1993)).

[18] *Id.* (citing *Schlesinger*, 2 F.3d at 139; *Collins v. Baptist Memorial Geriatric Ctr.*, 937 F.2d 190, 194 (5th Cir. 1991)).

[19] *Id.* (citing *Interfirst Bank of Abilene, N.A. v. Lull Mfg.*, 778 F.2d 228, 234 (5th Cir. 1985)).

No. 11-40653

language in the form a legal conclusion, stating that the expenses are not significant enough to frustrate Garner's RLUIPA claim.

We find no error in the form of district court's opinion. With respect to the paragraph quoted above, TDCJ's evidence concerning increased costs was vague and consisted primarily of speculation and conjecture. There was no evidence concerning concrete numbers besides testimony that a single disposable razor costs four cents while an electric clipper costs thirty-four dollars. The district court cannot be faulted for not making an exact finding with regard to costs.

More generally, the district court clearly discusses its view of the evidence presented. It found, for various reasons, that TDCJ's arguments that allowing beards poses great safety risks were unfounded, that there is at least one viable alternative to achieve easy identification of inmates, and that the costs, whatever the exact number is, would be insignificant. The district court thus concluded that "TDCJ's grooming policy does impose a substantial burden on an important aspect of the Plaintiff's exercise of his Muslim religion, and the Defendants have failed to sustain their burden of showing that the policy represents the least restrictive means of furthering a compelling government interest." The district court's order gives us a clear understanding of the basis of its decision and its conclusions. It did not violate Rule 52(a)(1).

## IV

TDCJ argues that the district court erred in holding that the no-beard policy violates RLUIPA because it is not the least restrictive means of furthering a compelling government interest. TDCJ has not challenged the finding that the policy imposes a substantial burden on Garner's religious exercise, so we do not address that issue.

Although TDCJ argued below that its policy furthers the state's interest in security because quarter-inch beards can be used to hide contraband, TDCJ does not press that argument on appeal. It advances two main arguments in

7

this court. First, it contends that the no-beard policy advances the compelling interest in controlling costs. Second, it argues that the no-beard policy advances the compelling interest in security because the policy promotes easy identification of inmates.

In support, TDCJ cites two cases of this court, *DeMoss v. Crain*[20] and *Gooden v. Crain*,[21] in which we upheld the TDCJ no-beard policy as compliant with RLUIPA. In *DeMoss*, we held that the district court's finding that a partial or total repeal of the no-beard rule, the two alternatives proposed by the plaintiff, would impose additional costs was not clearly erroneous and that the no-beard rule was the least restrictive means of advancing the compelling government interest in security and controlling costs.[22] Similarly, in *Gooden*, an unpublished opinion, we held that the no-beard rule furthered the compelling government interest in security and was the least restrictive means of doing so.[23] The district court found that making an exception for quarter-inch beards would make identification of inmates more difficult.[24] We noted, however, that Gooden offered little evidence in response to TDCJ's evidence and explicitly made "no broad holding that the grooming policy, as it applies to quarter-inch beards, will always be upheld."[25]

*DeMoss* and *Gooden* are not controlling here. In both cases, the plaintiffs were pro se and there is no indication that they countered TDCJ's evidence as Garner has done. In this case, we are presented with a substantially different

---

[20] 636 F.3d 145 (5th Cir. 2011) (per curiam).

[21] 353 F. App'x 885 (5th Cir. 2009) (per curiam).

[22] *DeMoss*, 636 F.3d at 153-55.

[23]  *Gooden*, 353 F. App'x at 887-89.

[24] *Id.* at 889.

[25] *Id.* at 889 n.3.

record.   Garner disputed TDCJ's evidence: he was represented by counsel, thoroughly cross-examined all TDCJ witnesses, proposed different alternatives to the no-beard policy than have been previously offered, and presented expert testimony from a long-time prison administrator.   Our decisions in *DeMoss* and *Gooden* are not controlling in light of the more-developed record and the factual findings present here that were not present in previous cases.   Those cases contained no evidence or factual findings regarding other jurisdictions' beard policies or TDCJ's current policy with respect to head shaving.   Nor had the district courts in those prior cases found that the state failed to show that increased costs due to a religious exemption would be significant.

## A

TDCJ argues that its no-beard policy is the least restrictive means of advancing the compelling government interest in controlling costs.   It is undisputed that controlling costs is a compelling government interest and that we must give deference to prison administrators.[26]   However, RLUIPA "may require a government to incur expenses in its own operations to avoid imposing a substantial burden on religious exercise."[27] With these principles in mind, the record reflects that TDCJ has not carried its burden of showing that its policy is the least restrictive means of advancing the interest in controlling costs.

TDCJ presented testimony from multiple witnesses that allowing quarter-inch beards for religious reasons would impose additional costs.   William Stephens, the deputy director of prison and jail operations within TDCJ, who

---

[26] *DeMoss*, 636 F.3d at 154 (citing *Baranowski v. Hart*, 486 F.3d 112, 125 (5th Cir. 2007)); *see also Cutter v. Wilkinson*, 544 U.S. 709, 723 (2005) (noting that Congress recognized that courts would apply RLUIPA's standard with "due deference to the experience and expertise of prison and jail administrators in establishing necessary regulations and procedures to maintain good order, security and discipline, *consistent with consideration of costs and limited resources*." (emphasis added) (internal quotation marks omitted)).

[27] 42 U.S.C. § 2000cc-3(c).

was also qualified as an expert to give his opinion on the effects of allowing Muslim inmates to wear quarter-inch beards, testified that he was concerned about the added cost of allowing beards. He noted, for example, that some large institutions currently have only one barbershop and would likely have to expand. He also testified that costs would be imposed due to greater use of barbershop equipment. Rick Thaler, the Director of the Correctional Institutions Division of TDCJ, testified that if inmates were allowed to grow quarter-inch beards, then staff would have to take more valuable time to enforce the grooming policy. Allowing beards would also require additional trips to the barbershop by each inmate. He also testified that it is expected that TDCJ's budget is going to be "extremely tight" in the near future. Finally, he testified that the option of requiring a new photo ID card when an inmate grows a beard, for which the inmate would pay an additional charge, would be costly because half of the prison population is indigent, and the volume of ID cards issued would increase significantly.

Billy Pierce, the Director of Chaplaincy Operations for TDCJ, testified about the increased burden allowing Muslim inmates to grow beards would put on chaplains. He testified that chaplains would have to verify the religious beliefs of inmates, keep lists of inmates in the faith group allowed to have a beard, continually update the list, and make sure housing areas had the list. He also testified that when certain faith groups have received special privileges in the past, the number of inmates claiming to belong to that faith group increased dramatically.

In contrast, Garner established through exhibits and testimony that the TDCJ had made no studies concerning the costs of allowing inmates to grow beards. Garner elicited testimony from Stephens that "there has not been a specific study made" with respect to cost, although "[t]here ha[ve] been some general reviews about cost." Stephens agreed that he does not "know from an

economic analysis standpoint all of the factors that would have to be considered to determine what is or is not cost effective over the long term." Garner also elicited testimony that TDCJ already tracks inmates' expressed beliefs, although it does so on a central computer and on each inmate's housing papers, not on a list kept by the chaplains on each unit.

Based on this record, we cannot say that the district court's finding that any increased costs would be insignificant is clearly erroneous. Although there was testimony that there would be additional costs, whether due to the construction of barbershops, the purchase of barbering supplies, or the creation of new identification cards, almost all of that testimony was speculative. The Defendants admitted that no specific studies had been done other than general reviews. We recognize that it is possible that allowing quarter-inch beards *could* impose some administrative costs in enforcement. However, while TDCJ witnesses testified that a quarter-inch limit would be difficult to enforce, their testimony concerning these administrative costs was also speculative. For example, Thaler testified that the time for enforcement "would potentially" take time from other tasks. There is no testimony regarding what other tasks would be affected or the amount of time that would be necessary in order to enforce a limit on beard length. Furthermore, TDCJ imposes limits on hair length, requiring that it be trimmed up the back of the head and neck and be cut around the ears, and although Stephens testified that enforcement is time-consuming, there is no evidence that TDCJ would encounter greater or added difficulty if it enforced a one-quarter-inch as opposed to a clean-shaven rule.

RLUIPA "may require a government to incur expenses in its own operations to avoid imposing a substantial burden on religious exercise."[28] TDCJ has presented testimony only that its costs would increase. It has not attempted

---

[28] *Id.*

to approximate the amount of those costs, and it has not presented any concrete evidence concerning how other operations of the prison system would be affected by these increased costs.  Such speculative testimony cannot satisfy TDCJ's burden.

**B**

TDCJ also argues that its no-beard policy is the least restrictive means of furthering the compelling interest in security because the policy aids rapid identification of inmates.  TDCJ presented testimony that if inmates were allowed to grow beards, identification would be hindered.  John Moriarty, the Inspector General for TDCJ, testified that identification is important both for inmates within the prison and for capturing escaped inmates.  Director Thaler testified that TDCJ had recently decided to retain its current grooming policy based largely on the fact that "the issue of positive identification of individuals as [they are moved] throughout the facility [is] a cornerstone to good correctional practice."  In his opinion, having inmates have their beards trimmed regularly at the barbershop, as is done with hair, is not an acceptable alternative because "any time you move your offender population around your institution, you subject your security process to vulnerabilities."

Garner, on the other hand, elicited testimony that the security issues with allowing all inmates or some inmates to wear beards is not as serious as TDCJ asserts.  Inmates are allowed to shave their heads, and Moriarty was not aware of any incident in which an inmate shaved his head in prison to change his appearance.  In fact, he was not aware of any inmate changing his appearance after committing a crime in jail other than by changing clothes.  Thaler testified that prohibiting inmates from shaving their heads had been contemplated but ultimately was not adopted as a policy, even though he agreed that an inmate shaving his head would change the inmate's appearance just as much as growing a quarter-inch beard.  In addition, Garner presented the testimony of an expert

witness, George Sullivan, whom the district court found has "decades of practical experience in managing correctional institutions." Sullivan testified that, in his experience, institutions that allow beards are no less safe than those that do not. He testified that in the prison setting, it is not generally more difficult to identify an inmate with a beard because officers become familiar with the inmate. He acknowledged that it is a little more difficult in systems with larger populations, like California, Texas, and the Federal Bureau of Prisons, because of the numbers, but "if the officer is doing his job . . . and is paying attention to the inmates as they come in his proximity, he should have no problem at all shifting his mental gears to keep up with the appearance of inmate." He disagreed with the argument that permitting inmates to maintain beards would pose identification difficulties.

On this record, TDCJ has not carried its burden to show that its no-beard policy is the least restrictive means of furthering the compelling government interest in security. Although TDCJ has presented evidence that allowing inmates to have beards hinders inmate identification, there was undisputed evidence that TDCJ allows inmates to shave their heads, and there was testimony that shaved heads pose just as many identification problems as allowing prisoners to grow and shave beards. TDCJ has not shown why any security concerns could not be addressed by requiring an inmate to have his identification picture changed if he grows or shaves his beard, as apparently is already required when an inmate changes his appearance in any way. As discussed above, TDCJ has not shown any reason why costs related to identification cards would be significant. One TDCJ witness admitted that requiring a new identification card to be made when an inmate grows a beard can, in a general sense, accommodate the need to identify him as he moves through the facility. We also find it persuasive that prison systems that are comparable in size to Texas's—California and the Federal Bureau of

No. 11-40653

Prisons—allow their inmates to grow beards, and there is no evidence of any specific incidents affecting prison safety in those systems due to beards.

With respect to an escaped prisoner, Garner observes that nothing prohibits an escapee from changing his appearance by, for example, growing out his hair or wearing a wig. Moriarty testified that TDCJ can do nothing to prevent an inmate from changing his appearance outside of the prison. Based on the present record, we cannot say that the district court's factual findings are clearly in error.

\* \* \*

We recognize that in applying RLUIPA, we must accord "due deference to the experience and expertise of prison and jail administrators."[29] However, based on the present record, the state has not satisfied its burden under RLUIPA. Therefore, we AFFIRM the district court's judgment.

---

[29] *Cutter v. Wilkinson*, 544 U.S. 709, 717 (2005) (internal quotation marks omitted).