# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

August 27, 2013

No. 12-41015

Lyle W. Cayce
Clerk

WILLIAM E. CHANCE, JR.,

Plaintiff-Appellant

v.

TEXAS DEPARTMENT OF CRIMINAL JUSTICE; BRAD LIVINGSTON, in his official capacity as Executive Director of the Texas Department of Criminal Justice; CYNTHIA LOWERY, in her individual capacity; BILL PIERCE, in his individual capacity; EDGAR BAKER, in his individual capacity; WARDEN JOHN RUPERT; WARDEN TODD FOXWORTH,

Defendants-Appellees

Appeal from the United States District Court
for the Eastern District of Texas
USDC No. 6:11-CV-435

Before STEWART, Chief Judge, and DAVIS and WIENER, Circuit Judges.

W. EUGENE DAVIS, Circuit Judge:[*]

Plaintiff-Appellant William Chance, Jr. ("Chance") is a prisoner currently incarcerated by the Texas Department of Criminal Justice ("TDCJ"). Chance filed suit under the Religious Land Use and Institutionalized Persons Act ("RLUIPA") alleging that TDCJ has failed to accommodate several tenets of his

---

[*] Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

No. 12-41015

Native American religion, including: (1) personal participation in a pipe-smoking ceremony, (2) participation in a minimum number of various ceremonies, (3) indoor smoke-wafting, and (4) personal possession of a lock of a deceased relative's hair. We agree with the district court that the summary judgment record demonstrated that the prison policies associated with Chance's first three complaints are the least restrictive means of furthering TDCJ's compelling interests. However, we disagree with the district court that summary judgment was appropriate on Chance's claim that prohibiting the possession of a lock of a relative's hair was not the least restrictive means of furthering TDCJ's compelling interests. We therefore AFFIRM the district court's judgment in part, and VACATE and REMAND it in part.

## I.

Chance is a prisoner currently incarcerated in the TDCJ's Michael Unit in Tennessee Colony, Texas. The Michael Unit is among several TDCJ incarceration units specifically designated to house adherents of Native American faith groups. Chance traces his lineage to the Cheyenne people, a recognized tribe of indigenous Native Americans. Chance is also a practicing follower of a traditional Native American faith.[1] According to Chance, an integral part of his faith and worship is the requirement that he regularly participate in a number of traditional rituals and ceremonies, including the "Sacred Pipe ceremony," the "Smudging ritual," the "Teaching ceremony," holy day ceremonies ("Wiping Away the Tears ceremonies"), and the "Keeping of Souls" practice.

---

[1] According to amici Pan-American Indian Association et al., the Native American faith we are concerned with in the instant case is an inclusive "Pan-Indian" belief system which broadly incorporates the practices and rituals common to the different Native American tribal groups of the American Great Plains.

No. 12-41015

Arguing that TDCJ has failed to adequately accommodate these practices, Chance filed this lawsuit in June 2011, asserting multiple violations of RLUIPA.[2] TDCJ moved for summary judgment, arguing that there was no genuine issue of material fact and that it was entitled to judgment as a matter of law. As is discussed in greater detail below, the magistrate judge agreed and issued a report recommending that TDCJ's motion be granted and all of Chance's claims be dismissed. The district court adopted the magistrate judge's report and recommendation, and Chance now appeals.

### A. The Sacred Pipe Ceremony

Chance alleges that a cornerstone of his Native American faith is participation in the Sacred Pipe ceremony. For adherents of the Native American faith, it is only by personally smoking a mixture of herbs and tobacco from a special pipe that they can offer their prayers to the Spirits. During the ceremony, the Sacred Pipe is passed around the group, with each participant smoking the pipe and offering his personal prayers as he exhales the smoke.

For most of Chance's incarceration, he and other prisoners were allowed to smoke a communal Sacred Pipe. From 2008 to 2010, Chance was even permitted to smoke a separate Sacred Pipe due to his chronic infections with Hepatitis C and tuberculosis. It is unclear what happened to Chance's separate pipe, but it is undisputed that he no longer had access to it sometime in 2010. Thereafter, Chance and several other prisoners filed administrative grievances with TDCJ complaining about the risk of communicable disease transmission from a communal pipe. In his grievance, Chance specifically cited his own chronic infections as preventing him from using the communal pipe and entitling him to a separate pipe.

---

[2] Chance also asserted violations of the Free Exercise Clause and the Equal Protection Clause. Because Chance has only appealed the district court's decision dismissing his RLUIPA claims, we do not reach those issues in this appeal.

No. 12-41015

In an effort to resolve the prisoners' concerns about disease, the grievances were referred to Dr. Robert Williams, Deputy Director of TDCJ's Health Service Division. Dr. Williams subsequently issued a detailed opinion on the health implications of using a communal pipe in the Sacred Pipe ceremony. Dr. Williams ultimately concluded: "There is no way to share an object designed to be placed in one's mouth outside of a clinical setting with enough certainty that diseases cannot be transmitted for Health Services to advocate instituting this practice." Based on Dr. Williams's recommendation, TDCJ determined that it would no longer permit a communal Sacred Pipe ceremony. Although a form of the Sacred Pipe ceremony would still be held, only the chaplain conducting the service would be allowed to smoke the pipe and pray on behalf of those present.

Chance subsequently filed this suit, alleging that TDCJ's new Sacred Pipe policy was an insufficient accommodation of his religious exercise under RLUIPA, because his personal participation in the pipe ceremony is essential. In response to TDCJ's motion for summary judgment, the district court found that although the policy substantially burdened Chance's religious beliefs, it is nonetheless the least restrictive means of furthering TDCJ's compelling interests in prison health, administration, and security. Accordingly, TDCJ's Sacred Pipe policy did not violate RLUIPA.

## B. Frequency of Native American Ceremonies

The second major grievance asserted by Chance is the insufficient frequency of Native American ceremonies in the Michael Unit. According to Chance, Native American believers must regularly participate in Sacred Pipe ceremonies, as well as "Teaching ceremonies" and "Wiping Away the Tears ceremonies." A Teaching ceremony is a Sunday school-style ceremony where Native Americans receive teaching and participate in discussions concerning their beliefs. A Wiping Away the Tears ceremony is a special Sacred Pipe ceremony conducted in observance of a Native American holy day.

4

No. 12-41015

Around the same time that TDCJ modified its Sacred Pipe policy, it began having difficulty finding volunteers or chaplains to oversee any of the traditional Native American services in the Michael Unit. As a result, TDCJ could not offer all of the services requested by Native Americans. Chance claims that his beliefs require twice-monthly Sacred Pipe ceremonies, weekly Teaching ceremonies, and four annual Wiping Away the Tears ceremonies on certain holy days. Instead, TDCJ provides Sacred Pipe ceremonies once a month, Teaching ceremonies once a month, and Wiping Away the Tears ceremonies on four *different* Native American holy days. In addition, TDCJ offers Native American "Talking Circle"[3] activities twice each month and religious DVD presentations once a month. Chance, however, insists that these are inadequate substitutes for the formal Sacred Pipe and Teaching ceremonies and the holy day recognition his faith requires.

Chance's complaint alleged that TDCJ's failure to provide more Sacred Pipe, Teaching, and holy day ceremonies unreasonably burdened his religious exercise under RLUIPA. However, the district court reasoned that given the number of prisoners and faith groups represented in Texas prisons, TDCJ could not be expected to provide weekly services that catered to everyone. Accordingly, TDCJ's failure to provide more Native American ceremonies did not violate RLUIPA.

**C. The Smudging Ritual**

Like the Sacred Pipe ceremony, the Smudging ritual is an elemental component of the Native American faith. Smudging is ordinarily done in conjunction with other Native American rituals such as the Sacred Pipe and Teaching ceremonies. It involves burning a small amount of herbs and then fanning the resulting smoke over the individual, any sacred object to be used,

---

[3] During a Talking Circle, Native American participants are each given the opportunity to voice what the "Great Spirit" has placed on their heart, similar to a Christian Bible study.

and the ceremonial site. For Chance and other adherents of the Native American faith, Smudging is necessary to purify ceremonial objects and participants in order to make contact with the Spirits.

From 1998 to 2009, Chance and other Native American believers were allowed to "Smudge" indoors just before their regular Sacred Pipe and Teaching ceremonies. Specifically, the ceremonies and the Smudging were conducted in the Michael Unit's gymnasium, which is where all such group gatherings are held. However, sometime in 2009, a new fire alarm system was installed in the gymnasium and TDCJ no longer permitted indoor Smudging. According to Chance, the only place where Smudging is now permitted—and therefore the only place where the Sacred Pipe and Teaching ceremonies can be properly conducted—is outside. This is insufficient, Chance maintained, because without an indoor Smudging option, inclement weather now forces the cancellation of an essential Native American ritual. Chance's complaint alleged that the refusal to accommodate indoor Smudging rituals unreasonably burdened his religious exercise under RLUIPA.

In response to TDCJ's summary judgment motion, the district court found that although the policy substantially burdened Chance's religious beliefs, it is nonetheless the least restrictive means of furthering TDCJ's compelling interests in prison administration and safety. Accordingly, the prison's indoor Smudging ban did not violate RLUIPA.

**D. The Keeping of Souls Ritual**

The Keeping of Souls Ritual is the process by which Native American believers honor their duty to mourn the death of relatives. The ritual traditionally requires Native American believers to keep a small lock of their deceased relative's hair for at least a year. Without possessing the lock of hair, survivors cannot properly mourn the death of a loved one or reconnect with them in the afterlife.

6

No. 12-41015

According to Chance, TDCJ has previously allowed a Native American prisoner to keep a lock of a relative's hair to observe the Keeping of Souls Ritual. However, when Chance requested that he be allowed to keep locks of his dead parents' hair, TDCJ denied his request. Because any item not received from an approved vendor could be used to smuggle in drugs, all items from family members are considered contraband.

Chance's complaint asserted that TDCJ's refusal to accommodate his request for a lock of hair unreasonably burdened his religious exercise under RLUIPA. However, the district court found that the prison's policy did not substantially burden Chance's religious beliefs, and even if it did, that the policy against contraband is the least restrictive means of furthering the state's compelling interests. Therefore, the contraband policy did not violate RLUIPA.

## II.

We review the district court's summary judgment *de novo*, applying the same standards as the district court. *Burge v. Parish of St. Tammany*, 187 F.3d 452, 464 (5th Cir. 1999). Summary judgment is only appropriate if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). When reviewing a grant of summary judgment, we construe all facts and inferences in the light most favorable to the non-moving party, here Chance.

## III.

RLUIPA provides that "no government shall impose a substantial burden on the religious exercise of a person residing in or confined to an institution, . . . even if that burden results from a rule of general applicability," unless the burden "is in furtherance of a compelling government interest" and "is the least restrictive means of furthering that compelling government interest." 42 U.S.C. § 2000cc-1(a). The plaintiff initially bears the burden of showing that "the challenged government action substantially burdens the plaintiff's religious

7

exercise." *Garner v. Kennedy*, 713 F.3d 237, 241 (5th Cir. 2013). Once the plaintiff makes that showing, the burden shifts to the government to show that its action or policy is the least restrictive means of furthering a compelling interest. *Id.* at 241–42. Although RLUIPA's standard places a heavy burden on the state, "'context matters' in the application of that standard." *Cutter v. Wilkinson*, 544 U.S. 709, 723 (2005) (citation omitted). We therefore review RLUIPA claims with "due deference to the experience and expertise of prison and jail administrators in establishing necessary regulations and procedures to maintain good order, security and discipline, consistent with consideration of costs and limited resources." *Id.*

As a threshold matter, a common thread throughout Chance's briefed RLUIPA claims is his argument that summary judgment on the issue of least restrictive means is inappropriate as a matter of law if TDCJ followed a more liberal policy in the past or if other prisons allow a practice that TDCJ forbids. Because Chance has offered evidence that TDCJ previously accommodated—and other institutions still accommodate—the ceremonies and rituals in question, Chance insists that summary judgment was inappropriate.

Nothing in the caselaw or the RLUIPA statute supports Chance's brightline rule. Instead, the wording of the RLUIPA statute suggests a fact-specific inquiry that takes into account the special circumstances of the individual prisoner and prison: A prison can substantially burden a prisoner's religious exercise if "the burden on *that* person . . . is in furtherance of a compelling government interest[] and is the least restrictive means of furthering *that* compelling governmental interest." 42 U.S.C. § 2000cc-1(a) (emphasis added). Decisions of this court have accordingly conducted case-specific inquiries

into whether a prison's policy is the least restrictive means of furthering the state's interests.[4]

At least one other circuit has rejected the per se rule offered by Chance, choosing instead to follow a case-specific approach when analyzing least restrictive means issues on summary judgment. As the Eighth Circuit explained in *Fowler v. Crawford*, a categorical rule defining the relevance of another prison's policy ignores the differences between institutions and all the other factors that might be more relevant in a given case. 534 F.3d 931, 941 (8th Cir. 2008). Specifically, the *Fowler* court considered a Native American prisoner's RLUIPA demand for access to a sweat lodge. In asserting his claim, the plaintiff prisoner relied heavily on the fact that another prison nearby permitted bi-annual sweat lodge ceremonies. *Id.* Rebuffing the prisoner's assertion that "they did it at [another prison], they can do it at [my prison]," the court affirmed the dismissal of the claim on summary judgment. *Id.* The court explained, "Although prison policies from other jurisdictions provide some evidence as to the feasibility of implementing a less restrictive means of achieving prison safety and security, it does not outweigh the deference owed to the expert judgment of prison officials

---

[4] *See, e.g.*, *Garner*, 713 F.3d at 245–46 (conducting detailed inquiry into whether ban on beards was least restrictive means); *Moussazadeh v. TDCJ*, 703 F.3d 781, 795–96 (5th Cir. 2012) (concluding that RLUIPA's least restrictive means analysis is conducted independently on record of each case); *see also Cutter*, 544 U.S. at 720 ("Properly applying RLUIPA, courts must take adequate account of the burdens a requested accommodation may impose on nonbeneficiaries."). The fact that Chance proposes this rule in the context of summary judgment does not change our conclusion. Summary judgment is appropriate if "there is no genuine dispute as to any material fact." FED. R. CIV. P. 56(a). Because the relevant facts are not in dispute or must be construed in one party's favor, "we are left with a pure question of law to decide." *See New Orleans Depot Servs., Inc. v. DOWCP*, 718 F.3d 384, 387 (5th Cir. 2013) (en banc). Therefore, construing all facts in favor of Chance, the question of least restrictive means is appropriate for summary judgment. *See, e.g.*, *Baranowski v. Hart*, 486 F.3d 112, 125 (5th Cir. 2007).

No. 12-41015

who are infinitely more familiar with their *own* institutions than outside observers." *Id.* at 942.[5]

In light of these principles and cases, we conclude that the mere existence of a prison policy that differs from a past policy or another institution's policy does not necessarily entitle a plaintiff to survive summary judgment on his RLUIPA claim. Not only does our RLUIPA analysis require a careful consideration of each case's specific facts, but there is also no reason to avoid summary judgment when the material facts are not in dispute. *See* Fed. R. Civ. P. 56(a).

### A.

Chance first argues that the district court erred by dismissing his Sacred Pipe ceremony RLUIPA claim. Specifically, Chance claims that TDCJ's complete ban on communal pipe-smoking is not the least restrictive means of furthering the state's interests. Because TDCJ has conceded the existence of a substantial burden, we proceed to the least-restrictive-means inquiry.

As an initial matter, TDCJ's duty to protect the health and safety of its prisoner population is indisputably an interest of the highest order. *See Cutter*, 544 U.S. at 717. TDCJ contends that its ban on communal pipe-smoking is necessary to prevent the spread of infectious diseases, especially in the closed, crowded population of a prison. To support its policy, TDCJ has offered expert testimony establishing that a "host of communicable diseases [could] be easily shared via a[n object] like a communal pipe such as flu, strep throat, norovirus, and mononucleosis just to name a few." Given that 125 to 150 prisoners routinely seek to participate in the Sacred Pipe ceremony, and that the rate of

---

[5] *See also Mays v. Springborn*, 575 F.3d 643, 647 (7th Cir. 2009) (affirming summary judgment dismissing prisoner's Free Exercise claim where "the only evidence he produced was that the [forbidden items] were allowed at other prisons"); *see also Spratt v. R.I. Dep't of Corr.*, 482 F.3d 33, 42 (1st Cir. 2007) ("[E]vidence of policies at one prison is not conclusive proof that the same policies would work at another institution.").

infection for many diseases is often much higher in prison, TDCJ's concerns about communal pipe-sharing are not unreasonable.[6]

Disregarding the fact that a communal Sacred Pipe ceremony will promote the spread of disease, Chance nonetheless insists that TDCJ's past accommodation of the Sacred Pipe ceremony precludes the prison from changing its position now. Also relevant, Chance contends, is the fact that other prisons in the United States permit a form of Sacred Pipe ceremony. However, Chance's dependence upon these anecdotal examples completely ignores TDCJ's sensible reason for banning communal pipe ceremonies. That TDCJ or other prisons have tolerated unsafe practices in the past is not a reason to permanently bind it to a dangerous policy. Though TDCJ may have a different policy than some prisons, it has provided evidentiary support for its decision that Chance has not even attempted to rebut. "Evidence of the rules in other prisons is not, by itself, sufficient to call into question the prison's explanation." *Mays*, 575 F.3d at 647.

Chance alternatively contends that TDCJ could have achieved substantially the same result with a less restrictive policy. For example, Chance suggests that the pipe could be cleaned with sanitizing wipes between each smoker, or that he could be allowed to use a separate pipe. However, Chance's proffered alternatives are not backed by any summary judgment evidence and largely ignore the concerns and evidence provided by TDCJ. Importantly, the record indicates that TDCJ considered and rejected a variety of alternatives to an outright ban on personal pipe-smoking. As TDCJ's Deputy Director of Health

---

[6] Chance asserts that to ban the practice of communal pipe-smoking, TDCJ must prove that its previous practice of allowing communal pipe ceremonies actually resulted in outbreaks of infectious diseases. However, no rule of evidence requires the use of anecdotal proof when competent testimony, scientific knowledge, and commonsense adequately support a conclusion. *See, e.g.*, *Fowler*, 534 F.3d at 939 ("Prison officials need not endure [dangerous behaviors] before implementing policies designed to prevent such activities in an uneasy atmosphere. Nor do prison officials charged with managing such a volatile environment need present evidence of actual problems to justify security concerns.").

Services, Dr. Williams, explained, "[s]terilization would be expensive and would not accommodate sharing the pipe in a meeting at the same time. If the sterilization process was not strictly adhered to, the process would not eliminate the risk of transmitting disease." Chance has also suggested that because of his serious illnesses, only he would need a separate pipe. However, this alternative does nothing to address the health risks still faced by the rest of the communal pipe ceremony participants. As Dr. Williams concluded in an opinion prepared before Chance ever filed his prison grievance or lawsuit:

> There is no way to share an object designed to be placed in one's mouth outside of a clinical setting with enough certainty that diseases cannot be transmitted for Health Services to advocate instituting this practice. If it is determined that [TDCJ's] obligation to allow observance of this practice outweighs [TDCJ's] obligation to prevent spread of infection in our institutionalized setting, [TDCJ] will have to take as effective measures as are feasible, but it should be understood that the repercussions of this practice may extend beyond the participants since they would subsequently expose others with whom they have close contact to any disease they contracted from participating in the practice.

Recognizing that another solution might be to allow every participant to smoke his own pipe, TDCJ has provided detailed evidence demonstrating why that also would not be feasible. According to the Michael Unit's Regional Director, Robert Eason, the amount of time it would take to distribute, inventory, and track every Native American believer's pipe would substantially burden the prison's limited resources and labor during every Sacred Pipe ceremony. Additional logistical problems are created by the necessity of cataloguing and storing several hundred pipes. As Director Eason explained, even if we assume the availability of disposable pipes, they are not a feasible alternative, either. Because tobacco is not permitted in Texas prisons, it is valuable contraband, and TDCJ would have to devote extensive manpower to

ensure that none of the 150 ceremony participants stole or hid any. Director Eason additionally demonstrated that the extra security required for monthly Sacred Pipe ceremonies with individual pipes would cost between $81,723 and $104,592 a year.

According an appropriate amount of deference to TDCJ's own expertise in prison administration, we conclude that it has established that its communal smoking policy is the least restrictive means of advancing its compelling interests. TDCJ has provided extensive, uncontroverted evidence demonstrating its consideration and reasoned rejection of a range of alternative policies. While it is true that Chance's religious exercise is burdened and that a chaplain smoking on his behalf is seemingly inadequate, "[w]e do not read RLUIPA to elevate accommodation of religious observances over an institution's need to maintain order and safety." *Cutter*, 544 U.S. at 722.

## B.

Chance next argues that the district court erred by dismissing his complaint about the infrequency of Sacred Pipe, Teaching, and Wiping Away the Tears ceremonies in the Michael Unit. Although TDCJ currently provides a monthly Sacred Pipe ceremony, a monthly Teaching ceremony, and four annual Wiping Away the Tears holy day ceremonies, Chance contends that his beliefs require two monthly Sacred Pipe ceremonies, two monthly Teaching ceremonies, and Wiping Away the Tears ceremonies on holidays more specific to his faith. The district court rejected Chance's assertion, concluding that the prison's provision of less frequent or different ceremonies did not constitute a violation of RLUIPA.

Assuming that Chance has demonstrated a substantial burden on his faith, TDCJ has offered substantial evidence demonstrating that its schedule of Native American services is the least restrictive means of furthering its compelling interests in prison administration, resource allocation, and cost

13

control. Billy Pierce ("Pierce"), TDCJ's Manager of Chaplaincy Operations, explained that the primary reason more frequent services cannot be held is the dearth of available people willing and able to oversee religious ceremonies. Pursuant to longstanding TDCJ policy, prisoners may only organize religious gatherings under the proper supervision of a contract chaplain or qualified outside volunteer. Since TDCJ is often unable to find chaplains to conduct weekly services for each of the 230 identified faiths in TDCJ's system, it relies heavily on outside religious volunteers to conduct services. However, Pierce indicated that he has faced great difficulty trying to solicit volunteers to conduct Native American services. Despite efforts to hire Native American chaplains and continuous requests to more than 60 Native American resource groups in the region from 2009–2012, Pierce was unable to obtain anything but religious recordings and fleeting commitments to help.

In addition to limited volunteer availability, Pierce noted: "Providing weekly or even monthly religious services to all these [230] different faith groups would be virtually impossible for numerous reasons, including, but not limited to, the large number of faiths, the number of offenders, security concerns, staffing and space limitations, and the large geographical expanse that TDCJ covers." Even with these concerns, TDCJ still manages to provide monthly Sacred Pipe ceremonies, monthly Teaching ceremonies, four annual Wiping Away the Tears ceremonies, and two monthly Native American "talking circles."

Our caselaw also forecloses Chance's claim on this record. In *Adkins v. Kaspar*, we considered whether imprisoned members of the Yahweh Evangelical Assembly had stated a RLUIPA claim when a shortage of volunteers prevented the members from congregating weekly. 393 F.3d 559, 570 (5th Cir. 2004). Rejecting the prisoner's assertion that TDCJ's volunteer requirement unduly burdened his faith, we reasoned that the requirement was reasonable, especially in light of the accommodations TDCJ made when volunteers were available. *Id.*

No. 12-41015

at 571. Other decisions of this court confirm that TDCJ's volunteer policy is a permissible attempt to accommodate diverse religious exercises with limited resources.[7]

The instant case is indistinguishable from *Adkins* and our other cases upholding TDCJ's religious volunteer policy.[8] Because the volunteer requirement is reasonable and necessary, and Native Americans have alternative opportunities to gather and worship, we conclude that it is the least restrictive means of furthering TDCJ's compelling interest in prison administration.

However, this conclusion does not end our inquiry into TDCJ's provision of Native American ceremonies. With regard to Chance's complaint about the provision of Wiping Away the Tears ceremonies, he complains not about their infrequency, but about their provision on the *wrong* holy days. In other words, the Native American holy days recognized by TDCJ do not correspond to the holy days revered by Chance.[9] If TDCJ provides ceremonies on certain Christian,

---

[7] *See Mayfield v. TDCJ*, 529 F.3d 599, 614 (5th Cir. 2008), (finding that TDCJ's volunteer requirement was permissible when prisoners were still provided with regular opportunities to congregate and worship); *Odneal v. Pierce*, 324 F. App'x 297, at *4 (5th Cir. 2009) (unpublished) (rejecting Native American prisoner's RLUIPA complaint about the infrequency of services where the "record detail[ed] the defendants' failed efforts to secure additional volunteers and chaplains for the Native American services"); *Baranowski*, 486 F.3d at 125.

While we have held that *Adkins* did not lay down "a per se rule that the TDCJ's volunteer requirement could never impose a substantial burden on a prisoner's exercise of religion," *Mayfield*, 529 F.3d at 614, our cases finding a burdensome application of that requirement are easily distinguished. *See, e.g.*, *id.* (finding factual dispute about whether the TDCJ volunteer requirement is a substantial burden on Odinist prisoners when evidence indicated that the only approved volunteer visited less than once a year); *McAlister v. Livingston*, 348 F. App'x 923, 937 (5th Cir. 2009) (finding factual dispute about whether the TDCJ volunteer requirement is a substantial burden on Wiccan prisoners when evidence indicated it was not enforced neutrally).

[8] Though our cases often analyze the volunteer requirement under the "substantial burden" prong of RLUIPA, we find that the volunteer restriction is also proper as the least restrictive means of furthering TDCJ's compelling interests.

[9] Although the Michael Unit used to recognize the four Native American holy days now designated by Chance, it discontinued that practice in 2008. In order to comply with a court

15

No. 12-41015

Islamic, and other Native American groups' holy days, Chance contends, it must also recognize and provide ceremonies on his holy days.       As we have already recognized with respect to increasing the frequency of Sacred Pipe ceremonies and Teaching ceremonies, TDCJ's provision of holy day ceremonies is limited by the lack of space, personnel, and available volunteers. However, this is especially true in light of TDCJ's obligations to provide regular services for other faith groups and to observe four different Native American holy days. As this court has recognized before, the standard prison practice of providing for the generic tenets of major faith groups is not only reasonable, but necessary in light of the prison's limited resources. As we stated in *Freeman v. TDCJ*, 369 F.3d 854, 861 (5th Cir. 2004),

> [A prison's] decision to offer worship services to five broad faith sub-groups, augmented by supplemental religious services to the other groups, . . . is eminently reasonable. Although some [individual] prisoners may not be able to attend a service perfectly suited to their faith, this limitation is dictated by the demands of administering religious services to tens of thousands of inmates representing widely divergent faiths.[10]

In another case, we recognized that the "generic structure of TDCJ [religious group] services maximizes inmates' religious liberty while addressing compelling government interests including security problems, staffing limitations, and space constraints." *Jones v. Shabazz*, 352 F. App'x 910, 915 (5th Cir. 2009) (unpublished).[11]

---

order in another case, the Michael Unit now observes the four Native American holidays revered in Native American Shamanism—another Native American religious sect.

[10] Although this decision was in the context of a First Amendment Free Exercise claim to which we apply less exacting scrutiny of prison regulations, these considerations remain relevant in the RLUIPA context.

[11] *See also Smith v. Kyler*, 295 F. App'x 479, 484 (3d Cir. 2008) (unpublished) (finding that hiring a Chaplain to perform religious services only for the "largest major faith groups" but permitting smaller groups to worship together with volunteer chaplains was the least

16

No. 12-41015

Just as it is a reasonable decision to provide generic Protestant services, Jewish services, or Native American pipe ceremonies, it is reasonable to limit the provision of special holiday services to generic Protestant, Jewish, and Native American holy days. Otherwise, as TDCJ points out, the prison would be required to accommodate the diverse holidays of the hundreds of recognized Native American tribes, as well as the various sects of other faith groups. Although prisons cannot blindly assert that an exception for one person would require exceptions for everyone, we have recognized the validity of such concerns where experience or evidence warrants that conclusion. *See, e.g.*, *Baranowski*, 486 F.3d at 118; *Garner*, 713 F.3d at 243.[12] When "inmate requests for religious accommodations become excessive, impose unjustified burdens on other institutionalized persons, or jeopardize the effective functioning of an institution, the facility [is] free to resist the imposition." *Cutter*, 544 U.S. at 726.

It is TDCJ that is most familiar with its own staffing and space limitations and the administrative burden of providing services across multiple faiths. Given the problems inherent in providing holiday services catered to every prisoner's individual beliefs, we conclude that TDCJ has demonstrated that providing generic Native American faith holiday services is the least restrictive means of furthering TDCJ's compelling interests.

C.

Chance next argues that the district court erred by dismissing his RLUIPA claim challenging TDCJ's policy of restricting the Smudging ritual to outdoor ceremonies. Specifically, Chance contends that Smudging should be done twice each month, in conjunction with the monthly Sacred Pipe and Teaching

---

restrictive means of furthering the prison's interests); *Boxer X v. Donald*, 169 F. App'x 555 (11th Cir. 2006) (unpublished) (recognizing same concerns); *Bruton v. McGinnis*, 110 F.3d 63 (6th Cir. 1997) (unpublished) (same).

[12] *See also Thunderhorse v. Pierce*, 364 F. App'x 141, 144 (5th Cir. 2010) (unpublished).

17

ceremonies. However, because Teaching ceremonies are held indoors and Sacred Pipe ceremonies can be forced indoors by rain, Native American believers sometimes must conduct important ceremonies without Smudging properly beforehand. Chance argues that this outright ban on indoor Smudging, which TDCJ concedes is a substantial burden, is not the least restrictive means of furthering TDCJ's interests.

As an institution tasked with managing the details of thousands of inmates' lives using a limited budget, TDCJ undisputably has a compelling interest in both prison safety and controlling costs. *See Garner*, 713 F.3d at 244. TDCJ contends that the only way it can fully protect its interests is by restricting the Smudging ritual exclusively to outdoor ceremonies. According to TDCJ, all large group activities in the Michael Unit are conducted in the unit's gymnasium, which has a smoke-activated fire alarm. Moreover, the Smudging ritual involves fanning the smoke of a burning bowl of herbs over each of up to 150 participants. As a result, TDCJ insists that it cannot permit Smudging without deactivating the fire alarm or risking false fire alarms, neither of which are permissible alternatives. To accommodate the Smudging ritual when it is forced indoors, TDCJ routinely permits "wet Smudging," whereby the ritual is conducted by handling wet herbs rather than burning dry herbs.

In response, Chance argues that the complete ban on indoor Smudging is not truly the least restrictive solution. First, Chance contends that TDCJ's concerns about the fire alarm are overblown, as the fire alarm has never been set off by Smudging. Second, Chance reiterates his argument that if the prison used to permit an activity, then prohibiting that activity cannot be the least restrictive solution. Because the prison allowed Smudging in the gymnasium in the past, he argues, it must continue to allow it. Third, Chance reasons that there are feasible, less-restrictive alternatives to an outright ban, including setting up a tent or shed outside.

No. 12-41015

However, Chance's arguments find no support in the law or in the record. The fire alarm has not been triggered by the Smudging ritual in the past because the Smudging ritual was banned from the gym as soon as the alarm was activated. Although TDCJ permitted indoor Smudging rituals in the Michael Unit gymnasium for several years, it has adequately explained why a new fire alarm required it to change its policy. Chance's additional assertion that the prison must wait until smoke sets off the fire alarm before safely concluding that smoke sets off fire alarms ignores common sense. *See Cubero v. Burton*, 96 F.3d 1450 at *2 (7th Cir. 1996) (unpublished) (applying RLUIPA precursor statute and upholding prison's ban on indoor Smudging); *Hodgson v. Fabian*, 378 F. App'x 592, 593–94 (8th Cir. 2010) (unpublished) (applying RLUIPA and upholding prison's ban on indoor Smudging). Finally, we are aware of no case in which a court has compelled a prison to spend the time and resources to construct a special outdoor structure merely because a religious group has demanded it.

Our deference to prison administrators and their interests in safety and cost control counsels in favor of dismissing Chance's Smudging complaint. Because TDCJ still permits Smudging outdoors and has offered uncontroverted evidence demonstrating the reasonableness of its determination to ban indoor Smudging, we conclude that its Smudging policy is the least restrictive means of achieving its compelling interests.

D.

Finally, Chance argues that the district court erred by dismissing his RLUIPA claim challenging TDCJ's denial of his request to possess locks of his deceased parents' hair in accordance with the Keeping of Souls practice. As Chance emphasizes, in the Native American faith, physical possession of a dead relative's hair is necessary to connect with them after death. On this issue, the district court found that the denial of Chance's request did not constitute a

19

substantial burden and held, alternatively, that even if Chance were substantially burdened, TDCJ's denial was pursuant to a policy that is the least restrictive means of furthering TDCJ's interests in prison security and administration.

Although the district court found that denying Chance's request to possess a lock of hair did not substantially burden his religious exercise, TDCJ has not briefed the issue on appeal. Conversely, Chance has consistently asserted that the possession of a lock of hair is something which is an important part of his faith. "[T]he place of a particular belief in a religion" is an assertion which we are peculiarly "ill-suited" to test, especially on summary judgment, and especially where the belief system is admittedly unfamiliar. *See Adkins*, 393 F.3d at 570.[13] In light of Chance's professed beliefs, the absolute denial of access to religiously-significant locks of hair is certainly a policy which "influences [Chance] to act in a way that violates his religious beliefs." *See id.* This satisfies the substantial burden requirement as we have described it.

Proceeding to the question of whether denying Chance the lock of hair is the least restrictive means of furthering TDCJ's compelling interests, we recognize that TDCJ certainly has a compelling interest in promoting prison order and preventing contraband from entering the prison. According to TDCJ, the prohibition of *all* personal items from non-approved vendors is the only way the prison can prevent contraband from entering the prison. Citing TDCJ's major contraband problems, Director Eason testified that "[a]ny time we open the door for individuals to send items in, it breaches the security of our institution, and that is our number one mission[, ] security and public safety. I mean, that is what we do." Unlike items from the prison's authorized vendors, items received from other persons might contain illegal weapons or substances.

---

[13] *See also Sossamon v. Lone Star State of Tex.*, 560 F.3d 316, 332–33 (5th Cir. 2009).

Specifically, TDCJ argues that even locks of hair could be dipped in a drug like PCP and later smoked. Moreover, TDCJ offered testimony concerning the problems posed by allowing only certain inmates to receive contraband items from relatives. As Director Eason explained, when one inmate is allowed the privilege of receiving something other inmates are not allowed—even hair—it could breed animosity and make that inmate a target.

In response, Chance presented evidence that TDCJ once permitted the possession of locks of hair, and that other institutions currently permit the possession of locks of hair. As Chance also points out, a small lock of hair is no more capable of being soaked in drugs than the letters in a prisoner's mail. Although TDCJ insists that mail is different because it is not sacred and can be handled and tested, these concerns are speculative and without record support. Moreover, this explanation ignores Chance's assertion that he would permit the hair to be tested or inspected, and even pay for the testing if required. Casting further doubt on TDCJ's asserted policy is evidence that TDCJ permits Native American prisoners to possess such objects as a bone or a tooth, which are apparently not available for purchase from traditional vendors.

Also relevant to our consideration is the fact that we have never gone as far as upholding an absolute, no-exceptions prison restriction on requests for outside objects.[14] Rather than deferring to the prison's general policy regarding a matter, we have consistently tested the prison's asserted interests with regard to the risks and costs of the specific accommodation being sought. *See Moussazadeh*, 703 F.3d at 795–96. Maintaining this approach is consistent with our observation that the availability of a less restrictive means is "a subject that demands a fact-intensive inquiry." *See id*. Other courts have similarly rejected

---

[14] *See, e.g., McFaul v. Valenzuela*, 684 F.3d 564, 572–73 (5th Cir. 2012); *Mayfield*, 529 F.3d at 602; *McAlister*, 348 F. App'x at 936.

generic appeals to prison security and prisoner uniformity, taking an object-specific approach to requests for religious items.[15]

For example, in *Mayfield v. TDCJ*, we considered an Odinist prisoner's request for religious runestones—small tiles made from antler, wood, or stone, and containing religious inscriptions. 529 F.3d at 602. Despite evidence presented by TDCJ that runestones could be used to gamble, pass secret messages, and identify gang members, we found that a ban on runestones might not be the least restrictive of effective alternative policies. *Id.* at 616. Although Odinist prisoners were already allowed to access runestones when an outside volunteer was present, we reasoned that a less restrictive alternative might be to allow the unit chaplain to store the runestones for use during other appointed times. *Id.* at 616–17. Because an absolute ban on locks of hair appears to be no more necessary than a *partial* ban on runestones, *Mayfield* militates strongly in favor of denying summary judgment to TDCJ on this issue.[16]

While we must give due deference to TDCJ's expertise in prison administration and security, *Cutter,* 544 U.S. at 723, this deference does have limits. If TDCJ can absolutely prohibit something as benign as a lock of hair by appealing to its general approved-vendors-only policy, then TDCJ could conceivably prohibit *anything*. On this record, there is a dispute about the

---

[15] *See, e.g., Craddick v. Duckworth*, 113 F.3d 83, 85 (7th Cir. 1997) (finding that prison had "not shown that medicine bags pose a genuine threat to prison security." (citation omitted));  *Singson v. Norris*, 553 F.3d 660, 662–63 (8th Cir. 2009) (finding that unrestricted access to tarot cards would create multiple security problems); *see also Hammons v. Saffle*, 348 F.3d 1250, 1255 (10th Cir. 2003); *Morrison v. Garraghty*, 239 F.3d 648, 660 (4th Cir. 2001); *Spies v. Voinovich*, 173 F.3d 398, 405 (6th Cir. 1999). A notable exception to this trend is a Free Exercise case from the Ninth Circuit, *Friend v. Kolodzieczak*, 923 F.2d 126, 128 (9th Cir. 1991). However, not only is the *Friend* case an outlier, but it also did not apply the tougher least restrictive means standard.

[16] *See also McAlister*, 348 F. App'x at 936 ("If the district court finds on remand that [plaintiff] has met his burden . . . then the district court should also determine (1) whether TDCJ has a compelling interest in prohibiting possession of *each* item . . . .") (emphasis added).

No. 12-41015

dangers posed by hair and the necessity of a no-exceptions policy, as well as the potential viability of simply inspecting or testing the hair. It also appears that there are a number of less restrictive alternatives to an outright ban, including restricting the lock of hair to the cell, washing it, inspecting it, or restricting its size. We therefore conclude that there is a genuine issue of material fact with regard to whether TDCJ's refusal to allow Chance to possess locks of relatives' hair is the least restrictive means of furthering TDCJ's compelling interests.

IV.

In sum, we hold that Chance has created a genuine issue of material fact only with regard to whether he may possess a lock of hair in prison. We therefore VACATE the district court's dismissal of that claim and REMAND it for further proceedings. The remainder of the district court's judgment is AFFIRMED.